CAPP INDUSTRIES, INC. *v.* SABINE H. SCHOENBERG ET AL.

ROBERT V. LARDON ET AL. *v.* JOHN CAPPIALI ET AL. (AC 27933)

McLachlan, Gruendel and Harper, Js.

Argued March 27—officially released October 2, 2007

*John F. X. Peloso, Jr.,* with whom was *Thomas J. Donlon,* for the appellants (named defendant et al. in the first case, plaintiffs in the second case).

*Matthew B. Woods,* for the appellees (plaintiff in the first case, defendants in the second case).

### Opinion

HARPER, J. This consolidated appeal arises out of an attempt by Capp Industries, Inc. (Capp), to foreclose a mechanic's lien against property owned by Sabine H. Schoenberg and Robert V. Lardon (property owners). After a joint trial of the two actions to the court, the court rendered judgment foreclosing the lien. The court ruled further that neither Capp nor its principal officers, John Cappiali and Beth Cappiali, had violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., or engaged in slander of title, abuse of process or fraud. On appeal, the property owners argue that the court determined improperly that (1) the execution of several mechanic's lien waivers by Capp did not preclude Capp from filing a mechanic's lien against the property, and (2) the actions taken by Capp and the Cappialis did not violate CUTPA or constitute slander of title, abuse of process or fraud. We disagree with the claims advanced by the property owners and, accordingly, affirm the judgments of the trial court in both actions.

The following facts and procedural history are relevant to the property owners' appeal. The Cappialis are

principal officers of Capp, a Connecticut corporation engaged in the business of site development and construction. The property owners jointly own a parcel of land located in Greenwich (property).

In late August, 2001, the property owners hired Capp to reposition bushes and other shrubbery on the property. Following the completion of this task, the property owners and Capp entered into a series of agreements to perform other work on the property. This subsequent work included relocating a large tree and some shrubs, demolishing an existing house, excavating a foundation for a new house and filling and grading the land behind the house. Neither the original agreement, nor any of the subsequent agreements between the parties was integrated into a formal written contract. The parties agreed orally, however, that the property owners would pay a fixed sum of money for the plant and tree relocation and demolition projects, and pay for the excavation and filling and grading work on the basis of the amount of time and materials expended by Capp.

Pursuant to the parties' oral agreement, the property owners paid Capp fully for the relocation and demolition projects, and made incremental payments to Capp for the excavation and filling and grading work. Following the property owners' first partial payment, Capp executed a two page mechanic's lien waiver (first waiver). That first waiver, dated December 4, 2001, and signed by John Cappiali on behalf of Capp, provided in pertinent part:

"Know all Men by these Presents,

"That we the undersigned . . . for the consideration of One Dollar . . . the receipt and sufficiency of which is acknowledged, to [the] full satisfaction of [Capp] . . . have waived and relinquished, and do hereby waive and relinquish, all liens and claims of liens upon [the property] . . . belonging to said [property owners]

. . . and upon the buildings now on said land, and also upon the buildings which are now in process of erection on said land, for work done or to be done and materials furnished or to be furnished in the erection, construction, or repair of said buildings or any of them.

"It is understood and agreed that any and all signatures hereto are for all services rendered, work performed and materials furnished, heretofore and hereafter, by the undersigned, in any and all capacities, and are not limited to the descriptive words following their names." Alongside the signature of John Cappiali, the following handwritten notation was made: "demolition [and] initial landscaping/shrub moving."

After the execution of the first waiver, Capp signed nine other mechanic's lien waivers in response to specific remittances from the property owners. Unlike the first waiver, the nine subsequent mechanic's lien waivers bore the heading "unconditional waiver of lien" and stated prominently at the beginning various information, including the date of their execution and the amount of the remittance. Underneath the heading and identifying information, the nine waivers provided in relevant part: "The undersigned subcontractor hereby acknowledges receipt of the above requisition and does hereby waive and release all liens or rights of lien now existing for work, labor and materials furnished through [this date] with respect to the above referenced project.

"The undersigned subcontractor further covenants and agrees that it shall not in any way, claim or file a mechanic's or other lien against the [property owners] or against the above Project, for any of the work, labor or materials heretofore furnished by it in connection with the improvement of the above Project and that [this sum of money] has been paid to date for work on this Project." All nine waivers were signed by either

John Cappiali or Beth Cappiali in their capacities as officers of Capp.

In February, 2002, the parties' relationship began to deteriorate, primarily as a result of disagreements over the timing and amount of payments due to Capp. These disputes culminated in the cessation of all work on the property in the middle of March, 2002, and in the termination of Capp's services on April 11, 2002. Capp subsequently filed a lis pendens and certificate of mechanic's lien against the property in the amount of $118,568.58.

Thereafter, by way of a complaint dated August 22, 2002, Capp filed suit to foreclose the mechanic's lien or, alternatively, to recover under the equitable theory of unjust enrichment (first action).[1] The property owners responded by filing an answer and four special defenses, one of which included the claim that Capp had signed several mechanic's lien waivers and thereby forfeited its right to file a mechanic's lien against the property.[2] In addition to the four special defenses, the property owners asserted a five count counterclaim against Capp for slander of title, abuse of process and fraud, as well as for violation of the Home Improvement Act, General Statutes § 20-418 et seq., and CUTPA. Almost one year later, the property owners filed a five count complaint alleging identical causes of action against the Cappialis in their individual capacities (second action). The Cappialis filed an answer and averred, by way of a special defense, that they could not be

[1] In addition to the property owners, Capp named Indymac Bank, FSB, and Bank United, FSB, as defendants in the first action. Despite filing appearances, the banks did not participate actively in the litigation and are not parties to this appeal.

[2] As amended, the other three special defenses alleged that the complaint failed to state a claim on which relief could be granted, and that Capp's claims were barred by the equitable doctrine of unclean hands and by Capp's violation of the Home Improvement Act, General Statutes § 20-418 et seq.

held individually liable for actions taken in their official capacities as officers of Capp.

The two actions were consolidated and tried to the court in October, 2005. On July 21, 2006, the court issued a memorandum of decision foreclosing the mechanic's lien and ruling in favor of Capp on all of the special defenses and the counterclaim in the first action,[3] and in favor of the Cappialis on all of the claims and the special defense in the second action. The court found that the lien waivers were intended by the parties to apply only to the portion of the work for which Capp had already received compensation from the property owners. As such, the lien waivers were ineffective to waive Capp's right to file a mechanic's lien as to the portions of the work for which it had not received payment. On the basis of the evidence presented at trial, the court further determined that Capp was owed $78,307, rather than the $118,568.58 claimed in the certificate of mechanic's lien. Accordingly, it rendered judgment foreclosing the lien in the amount of $78,307, and ordered that the case proceed to the foreclosure calendar for resolution of various details, including the manner of foreclosure, the value of the property and the amount of attorney's fees.

Because the filing of the mechanic's lien and lis pendens was not improper, the court determined that there was no basis for imposing individual liability on the Cappialis. For the same reason, the court rejected the property owners' slander of title and abuse of process claims against Capp and the Cappialis. Additionally, the court concluded that neither Capp nor the Cappialis had committed fraud by falsely representing that Capp

---

[3] Although Capp also sought recovery under the equitable theory of unjust enrichment, the court did not address this claim in its memorandum of decision. Presumably, the court believed that Capp included a claim of unjust enrichment in the event that it was precluded from foreclosing the mechanic's lien against the property.

was a licensed home improvement contractor within the meaning of the Home Improvement Act. Even if that misrepresentation had been made, the court reasoned, it was immaterial because the work performed by Capp did not fall within the provisions of the Home Improvement Act. Finally, having found no basis for holding Capp or the Cappialis liable for slander of title, abuse of process or fraud, the court held that there was no violation of CUTPA.

The property owners thereafter appealed from the judgment of foreclosure in the first action, and the rejection of their slander of title, abuse of process, fraud and CUTPA claims in both actions.[4] They also appealed from the court's ruling in the second action that, pursuant to the Cappialis' special defense, the Cappialis could not be held liable individually for any actions taken on behalf of Capp. Because the court failed to identify the method of foreclosure, this court, sua sponte, questioned whether the property owners were appealing from a final judgment. We conclude that they are not. We therefore dismiss the appeal to the extent that it challenges the foreclosure.[5]

[4] As the property owners note in their brief, the court did not specifically address the merits of their CUTPA claims in its memorandum of decision. The asserted violations of CUTPA, however, were premised on the allegations contained in the other four claims against Capp and the Cappialis. We are therefore satisfied that the court implicitly rejected the property owners' CUTPA claims when it rejected their other four claims.

Nonetheless, we will not review separately the court's rejection of the CUTPA claims because the property owners failed to brief them adequately. It is well settled that "[w]here the parties cite no law and provide no analysis of their claims, we do not review such claims." (Internal quotation marks omitted.) *Turner* v. *American Car Rental, Inc.*, 92 Conn. App. 123, 130–31, 884 A.2d 7 (2005).

[5] The court ordered the following: "Judgment hereby enters in favor of [Capp] that its mechanic's lien be foreclosed. The debt is found to be $78,307. Judgment is also entered in favor of [Capp] with respect to the counterclaim filed by the [property owners] for the reasons stated above. As indicated, this [first] case should now be claimed for the foreclosure calendar in order to determine the type and date of foreclosure, value of the [property] and other details, including the matter of attorney's fees." Under *Essex Savings*

# I

The court disposed of the slander of title, abuse of process and fraud claims solely on the basis of its finding that the mechanic's lien waivers applied to the portion of work for which Capp had received payment, rather than to all of the work performed on the property. On appeal, the property owners challenge the factual underpinnings of this determination by contending that the plain language of the waivers evidenced an absolute relinquishment of Capp's right to file a mechanic's lien. Because the waivers were clear and unambiguous, the property owners argue, the court's reliance on extrinsic evidence concerning the parties' intent at the time of their execution violated the parol evidence rule. We are not persuaded.

The following additional facts are necessary to our resolution of the property owners' claim. During trial, the Cappialis and Schoenberg were asked about their intentions in executing the mechanic's lien waivers. Beth Cappiali testified that at the time she signed the mechanic's lien waivers, she believed that Schoenberg was making an "incremental payment" and she, in turn, was providing an "incremental lien waiver for that amount." Similarly, John Cappiali characterized the mechanic's lien waivers as "receipts for the amount of money that [he and Capp] were receiving that day for that check." When asked whether he intended to effectuate a full waiver of Capp's right to file a mechanic's lien against the property, John Cappiali responded that "[t]hey weren't paid in full, so, no." Schoenberg testified

*Bank* v. *Frimberger,* 26 Conn. App. 80, 80–81, 597 A.2d 1289 (1991), a judgment of foreclosure is not a final judgment until the trial court determines the method of foreclosure and the amount of the debt. Id.

Accordingly, we conclude that this court lacks jurisdiction until the trial court determines the method of foreclosure. We therefore dismiss the portion of the appeal in the first action pertaining to the judgment of foreclosure, and the special defenses thereupon, for lack of a final judgment.

that she obtained the mechanic's lien waivers because she understood it to be "good business practice to have evidence of a completed job and payments made," and "evidence of the fact that [she and Lardon had] made full and complete payment for work performed." At no time during this testimony did either party object on the basis of the parol evidence rule.[6]

In its memorandum of decision, the court determined that neither the first waiver nor the nine subsequent waivers constituted a blanket relinquishment of Capp's statutory right to file a mechanic's lien against the property. In reaching this conclusion, the court credited expressly the testimony of the Cappialis that the mechanic's lien waivers were intended to apply to the portions of work for which they had received payment rather than to all work performed as of that time. The court also noted that the format of the last nine waivers suggested that the parties intended to execute them incrementally in accordance with the property owners' payments for completed work.

"Whether a party has waived a right to assert a mechanic's lien is a question of fact to be determined by the trial court. . . . Accordingly, the court's determination in this regard will be upset only if the record demonstrates that it was clearly erroneous." (Citation omitted.) *Aronne Building & Remodeling, LLC* v. *Ksiazek*, 101 Conn. App. 472, 475, 923 A.2d 757 (2007).

---

[6] The property owners' failure to object does not preclude us from reviewing this claim because "[the] parol evidence rule is not a rule of evidence but of substantive law. . . . [Accordingly] if the [extrinsic] evidence is admitted over objection or without objection, the question still remains for decision by the court whether under the circumstances of the particular case, any agreement extrinsic to the writing, even if proved, can in law be effective to add to, subtract from or vary the terms of the writing." (Citations omitted.) *Nagel* v. *Modern Investment Corp.*, 132 Conn. 698, 700, 46 A.2d 605 (1946); see also *Heaven* v. *Timber Hill, LLC*, 96 Conn. App. 294, 308, 900 A.2d 560 (2006). We note, however, that it would have been far better practice for the property owners to have raised the issue expressly before the trial court. See Practice Book § 60-5.

"Where, however, there is clear and definitive contract language, the scope and meaning of that language is not a question of fact but a question of law. . . . In such a situation our scope of review is plenary, and is not limited by the clearly erroneous standard." (Citations omitted.) *Pero Building Co.* v. *Smith*, 6 Conn. App. 180, 184, 504 A.2d 524 (1986).

"Well established principles guide our analysis in determining whether the language of a contract is ambiguous. [A] contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. [A]ny ambiguity in a contract must emanate from the language used by the parties. . . . In contrast, [a] contract is unambiguous when its language is clear and conveys a definite and precise intent. . . . The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity. . . . Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." (Internal quotation marks omitted.) *Smithfield Associates, LLC* v. *Tolland Bank*, 86 Conn. App. 14, 18–19, 860 A.2d 738 (2004), cert. denied, 273 Conn. 901, 867 A.2d 839 (2005).

Having set forth the basic principles of contract interpretation, we explain briefly the standard by which we review alleged violations of the parol evidence rule. "The [parol evidence] rule is premised upon the idea that when the parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing. . . . The parol evidence rule does not of itself, therefore, forbid the presentation of parol evidence, that is, evidence outside the four corners of the contract

concerning matters governed by an integrated contract, but forbids only the *use* of such evidence *to vary or contradict the terms* of such a contract. . . . By implication, such evidence may still be admissible if relevant (1) to explain an ambiguity appearing in the instrument; (2) to prove a collateral oral agreement which does not vary the terms of the writing; (3) to add a missing term in a writing which indicates on its face that it does not set forth the complete agreement; or (4) to show mistake or fraud." (Citation omitted; emphasis in original; internal quotation marks omitted.) *TIE Communications, Inc.* v. *Kopp*, 218 Conn. 281, 288–89, 589 A.2d 329 (1991).

Accordingly, we begin by examining the plain language of the waivers to determine whether they unambiguously reflect an intention to waive Capp's right to file a mechanic's lien for work it had performed but for which it had not received payment. Contrary to the property owners' assertions, our review of the waivers reveals that no such intention is clearly stated therein. We agree with the property owners that the first waiver manifests unequivocally an intent to relinquish fully Capp's right to file a mechanic's lien against the property. Had it been the only waiver at issue, the terms of the parties' agreement unquestionably would have been clear and unambiguous for parol evidence rule purposes. The clear language of the first waiver is belied, however, by the parties' execution of nine subsequent waivers with much more restrictive and situational language. The nine subsequent waivers, by their terms, do not apply to work performed after the date of their execution. Consequently, with respect to the extent to which Capp relinquished its right to file a mechanic's lien, the language of the last nine waivers is irreconcilable with that of the first.

Facially, the nine waivers do not indicate what effect, if any, they were intended to have on the terms of the

first waiver. As such, even if it were found that the first waiver constituted an absolute relinquishment of Capp's right to file a mechanic's lien, it is unclear whether the parties intended the nine subsequent waivers to modify the terms of the first waiver, thereby creating a new agreement. See *Spicer* v. *Spicer*, 33 Conn. App. 152, 159, 634 A.2d 902 (1993) (noting "[p]arties may alter any term of an existing contract by entering into a subsequent contract," in which case "[t]he contract as modified becomes a new contract between the parties" [citation omitted; internal quotation marks omitted]), cert. denied, 228 Conn. 920, 636 A.2d 850 (1994). The property owners posit that the blanket language of the first waiver was meant to control, and that they were merely being "very careful and very thorough" when they asked Capp to execute the nine subsequent waivers. In determining whether an agreement is ambiguous for parol evidence rule purposes, however, we are limited to whatever intent can be gleaned facially from the documents at issue. See *Smithfield Associates, LLC* v. *Tolland Bank*, supra, 86 Conn. App. 18. As explained previously, it is not evident from the parties' language that the last nine waivers were intended to duplicate, rather than to modify, the terms of the first waiver.

In this regard, we find it noteworthy that both parties presented evidence at trial to establish their intent in executing the lien waivers. At no time was there an objection to this testimony on the basis of the parol evidence rule. These facts indicate that the parties and the court tacitly understood that such extrinsic evidence was necessary to understand fully the meaning of the waivers, both individually and collectively. See *Heaven* v. *Timber Hill, LLC*, 96 Conn. App. 294, 307, 900 A.2d 560 (2006) (failure to object to evidence of parties' intent supports inference that contract not clear and unambiguous with respect to that issue).

We conclude that it is unclear from the ten waivers whether the parties intended for each to constitute separate and distinct waivers as to specific work, as the court found, or whether they were intended, either separately or conjunctively, to waive Capp's rights with respect to all of the work performed on the property. Given the ambiguity, it was entirely appropriate for the court to have relied on the parties' testimony to clarify their intent in executing the waivers.[7]

Because the ten mechanic's lien waivers were not clear and unambiguous, we will upset the court's finding as to the parties' intent only if it is clearly erroneous. A review of the record reveals that it is not. As mentioned previously, the court credited the testimony of the Cappialis that the waivers were intended to cover the portions of work for which they had received payment, rather than all of the work performed as of that time. The court observed that this interpretation was supported by the format of the last nine waivers, which suggested an intent to execute incremental waivers in accordance with specific remittances from the property owners.[8]

The contention that the court improperly interpreted the mechanic's lien waivers was the basis of the property owners' appeal of the slander of title and abuse of

---

[7] Because the parties' agreement was ambiguous as to whether the parties intended to effectuate a blanket waiver, the property owners' reliance on *Townsend* v. *Barlow*, 101 Conn. 86, 124 A. 832 (1924), *Snydergeneral Corp.* v. *Lee Parcel 6 Associates Ltd. Partnership*, 43 Conn. App. 32, 681 A.2d 1008 (1996); and *Pero Building Co.* v. *Smith*, supra, 6 Conn. App. 180, is misplaced. In those cases, unlike the situation here, the court was faced with the task of interpreting contract language that was clear and definitive.

[8] Although the property owners dispute the court's finding that each waiver applied only to specific portions of work, this type of question, based on subjective assessments of the evidence and credibility of the witnesses, is one this court is ill-suited to address. It is well established that on appeal, "[w]e cannot retry the facts or pass on the credibility of the witnesses." (Internal quotation marks omitted.) *Hunting* v. *Chambers*, 99 Conn. App. 664, 670, 916 A.2d 56, cert. denied, 283 Conn. 901, 926 A.2d 669 (2007).

process judgments in both actions.[9] As there is evidence in the record to support the court's finding as to the parties' intention in executing the waivers, we decline to disturb it on appeal. Accordingly, on the basis of those determinations by the court, the judgment against the property owners on their slander of title and abuse of process claims must be affirmed.

## II

The property owners raise two additional arguments in support of reversing the judgment of the court with regard to their fraud claims. First, the property owners challenge the court's conclusion that any misrepresentation regarding Capp's licensure under the Home Improvement Act was immaterial. Second, the property owners argue that the court misunderstood their fraud claims as being premised solely on the misrepresentation of Capp as a licensed home improvement contractor. To the contrary, the property owners contend that their fraud claims were also founded on the alleged falsification of daily worksheets and invoices. The failure of the court to consider this alternate basis for imputing liability for fraud, the property owners claim, warrants reversal of the judgment. Neither argument is persuasive.[10]

---

[9] The property owners also contend that the court improperly failed to discuss each element of their slander of title and abuse of process claims in its memorandum of decision. This argument merits little discussion. The court found that Capp was justified in filing the certificate of mechanic's lien and lis pendens, and initiated the foreclosure action properly. These findings were fatal to the property owners' slander of title claims; see *Elm Street Builders, Inc.* v. *Enterprise Park Condominium Assn., Inc.*, 63 Conn. App. 657, 670–71, 778 A.2d 237 (2001); and their abuse of process claims. See *QSP, Inc.* v. *Aetna Casualty & Surety Co.*, 256 Conn. 343, 361 n.16, 773 A.2d 906 (2001). There was therefore no need for the court to have engaged in a detailed analysis of all of the elements of both causes of action.

[10] Because there is no basis for finding the Cappialis liable for abuse of process, slander of title or fraud, we do not address the court's other conclusion that the Cappialis could not be held liable individually for actions taken on behalf of Capp.

"Under the common law . . . it is well settled that the essential elements of fraud are: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury. . . . All of these ingredients must be found to exist. . . . Additionally, [t]he party asserting such a cause of action must prove the existence of the first three of [the] elements by a standard higher than the usual fair preponderance of the evidence, which . . . we have described as clear and satisfactory or clear, precise and unequivocal." (Internal quotation marks omitted.) *Duplissie* v. *Devino*, 96 Conn. App. 673, 681, 902 A.2d 30, cert. denied, 280 Conn. 916, 908 A.2d 536 (2006). Finally, "[t]he party claiming fraud . . . has the burden of proof. . . . Whether that burden has been met is a question of fact that will not be overturned unless it is clearly erroneous." (Internal quotation marks omitted.) Id., 680.

We begin by briefly addressing the property owners' second argument. The property owners' claim is premised on the supposition that the invoices and daily worksheets were fraudulent and created retroactively by the Cappialis. This notion, however, was considered and rejected unequivocally by the court. Specifically, the court noted in its memorandum of decision that "the Cappialis testified plausibly and credibly that each day they posted to their computer the number of hours worked and the number of men working to create daily worksheets." The court also found "credible evidence to the effect that [Capp] advised the [property owners] at the beginning of the project of the daily cost of laborers and . . . machines."[11]

---

[11] The property owners claim in their appellate brief that the court "completely overlooked" the evidence that they presented at trial to establish Capp's "fraudulent billing." A review of the court's memorandum of decision reveals no basis for such a claim. When there is conflicting evidence, as here, it is the exclusive province of the court, as the trier of fact, "to

"It is well established that the absence of any element of a claim of fraud is fatal to the plaintiff's recovery." *Duplissie* v. *Devino*, supra, 96 Conn. App. 692. Here, the court weighed the evidence and concluded that the worksheets were created contemporaneously with the facts reported therein and that neither the worksheets nor the invoices were intentionally fabricated. Therefore, the property owners could not demonstrate that "a false representation was made as a statement of fact," as is required to establish liability for fraud.

Accordingly, we turn to the property owners' other argument concerning the alleged misrepresentation of Capp as a licensed home improvement contractor. The court refused to impute liability for fraud on this basis, reasoning that "the [Home Improvement Act] does not apply to this case, so even if [Capp] made an incorrect reference to its status as licensed, it is immaterial." Although it explained its overall rationale, the court did not indicate which of the four elements of fraud it found to be missing. More specifically, by stating that the alleged misrepresentation was "immaterial," the court could have meant that there was insufficient evidence of an intent to induce reliance on the statement, or insufficient evidence of actual, detrimental reliance thereupon, or both.

On account of this ambiguity in the court's decision, Capp and the Cappialis urge this court either (1) to dismiss this portion of the appeal because the property owners failed to seek an articulation pursuant to Practice Book §§ 60-5 and 66-5 or (2) to "presume that the

weigh the conflicting evidence, determine the credibility of witnesses and determine whether to accept some, all or none of a witness' testimony." (Internal quotation marks omitted.) *Sander* v. *Sander*, 96 Conn. App. 102, 112 n.12, 899 A.2d 670 (2006). In the absence of evidence to the contrary, we will not assume that a finding adverse to an appellant's case could only have been the product of a failure by the court to consider all of the evidence presented.

[court] made every finding of fact consistent with its judgment and rejected the version of the facts that the [property owners] claim their proffered evidence might have supported." It is undeniable that generally, a failure to seek an articulation when the record is unclear or inadequate would result in a refusal to review the claim at issue. See, e.g., *Stone-Krete Construction, Inc.* v. *Eder*, 280 Conn. 672, 685–86, 911 A.2d 300 (2006); *Tracey* v. *Tracey*, 97 Conn. App. 122, 128, 902 A.2d 729 (2006). As Capp and the Cappialis concede in their brief, however, the property owners were unable to obtain an articulation due to the subsequent unavailability of the judge who presided at trial. Under these circumstances, in which the property owners, through no fault of their own, could not have obtained an articulation, it would be unjust to decline summarily to review their claim.

With regard to our capacity to review the claim, we must adhere to the general rule that this court may not find facts in the first instance. See *Miller* v. *Westport*, 268 Conn. 207, 221, 842 A.2d 558 (2004). Here, however, the inability to determine the exact basis of the court's ruling is of no consequence because proof of detrimental reliance is absent as a matter of law.

"In equity, as in law, misrepresentation, to constitute fraud, must be material. . . . That is to say, the representation must prejudice the party relying upon it." (Internal quotation marks omitted.) *McCann Real Equities Series XXII, LLC* v. *David McDermott Chevrolet, Inc.*, 93 Conn. App. 486, 519, 890 A.2d 140, cert. denied, 277 Conn. 928, 895 A.2d 798 (2006). Here, the property owners argue that they suffered prejudice because "they hired Capp to do work based on its having a license and were injured by receiving bad work that had to be remedied by another company." Yet, even if

those facts were proven, they still would not demonstrate that the property owners relied on the representation to their detriment as required to state a cognizable claim of fraud. Capp initially was hired in August, 2001, only to reposition bushes and other shrubbery on the property. That arrangement, for which Capp received full payment, was entirely separate from later agreements at issue in this appeal. The property owners have never claimed that they sustained damages during the course of Capp's performance of the plant and shrub relocation work. Accordingly, even if the property owners originally hired Capp on the basis of misinformation concerning its status as a licensed home improvement contractor, they were not damaged by their reliance thereupon.

At trial, the property owners' evidence of fraud pertained exclusively to Capp's performance of later, entirely separate agreements related to the excavation and filling and grading work. Under the property owners' theory, the damages that they allegedly incurred consisted of being charged for work that they claim was never performed and being overcharged for work that admittedly was performed on the property. These damages, however, were not causally related to the alleged misrepresentation that Capp was a licensed home improvement contractor under the Home Improvement Act. Stated differently, there is simply no nexus between the alleged misrepresentation regarding Capp's licensure under the Home Improvement Act and the alleged fraudulent billing that purportedly damaged the property owners thereafter.

In that regard, this case is analogous to *McCann Real Equities Series XXII, LLC* v. *David McDermott Chevrolet, Inc.*, supra, 93 Conn. App. 519, in which the plaintiffs alleged fraud on the basis of misrepresentations regarding the environmental condition of real property that they had purchased. There, the court

found that one of the defendants had stated erroneously that two aboveground storage tanks on the property had never been used, and that a liquid found below the tanks in the basement of one of the buildings was "only rainwater . . . ." (Internal quotation marks omitted.) Id., 499–500. In fact, the plaintiffs discovered later that the tanks had been used to store waste oil, and the mysterious liquid in the basement below the tanks was a mixture of oil and water.[12] Id., 500. As a result of the spillage in the basement, the soil surrounding the area required extensive remediation after the sale of the property. Id., 501–502.

On appeal, this court upheld the trial court's rejection of the plaintiff's allegation of fraud because there was no evidence demonstrating that the plaintiffs relied on the statements to their detriment. Id., 509. Specifically, this court determined that the representations "were not material to the plaintiffs' loss" in light of the trial court's findings that the plaintiffs discovered the falsity of the statements before the sale of the property and, more importantly, before they sustained any damages. Id., 519. Furthermore, this court concluded that the plaintiffs had failed to state a claim of fraud because "there was no causal connection between the plaintiffs' alleged damages [flowing from the remediation of the soil], and [the defendant's] representation[s] . . . ." Id., 509.

Here, as in *McCann Real Equities Series XXII, LLC*, the property owners have not proven that any connection exists between the alleged misrepresentation and

---

[12] The plaintiffs in *McCann Real Equities Series XXII, LLC*, also claimed that the defendants failed to disclose three letters from the department of environmental protection that discussed testing results on the property generally but not the condition of the specific area at issue. *McCann Real Equities Series XXII, LLC* v. *David McDermott Chevrolet, Inc.*, supra, 93 Conn. App. 519. The court found, however, that the defendants were not under a contractual duty to disclose those documents to the plaintiffs. Id., 506.

the damages that they allegedly sustained thereafter. Because the property owners are unable to causally link the misrepresentation to the damages incurred, they are incapable of demonstrating detrimental reliance, which is a necessary element of a cause of action for fraud. With regard to the fraud claims, therefore, the court rendered judgment properly in favor of Capp in the first action and in favor of the Cappialis in the second action.

The appeal is dismissed with respect to the judgment of foreclosure in the first action for lack of a final judgment. The judgment on the counterclaims in the first action is affirmed. The judgment in the second action is affirmed.

In this opinion the other judges concurred.